FILED'10 DEC 15 9:40USDC-ORM

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

MICHAEL S. RANF,                                    Civil No. 09-586-CL

                    Plaintiff,              **REPORT AND RECOMMENDATION**

        v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

                    Defendant.

CLARKE, Magistrate Judge.

        Plaintiff Michael S. Ranf brings this action pursuant to section 205(g) of the Social

Security Act, as amended (Act), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of

the Commissioner's final decision denying plaintiff's application for disability insurance benefits.

For the reasons set forth below, the decision of the Commissioner should be affirmed in part and

remanded in part for further proceedings consistent with this recommendation.

## **PROCEDURAL POSTURE**

        Plaintiff filed concurrent applications for Social Security Disability (SSD) and

Supplemental Security Income (SSI) disability benefits on April 4, 2005, alleging disability

beginning May 1, 1999. (Pl. Br. at pp. 1, n. 1; Tr. 14). His claims were denied in initial

determinations dated May 20, 2005, and plaintiff did not request reconsideration. (Tr. 14, 38-

42).[1]  Plaintiff filed concurrent applications for SSD and SSI disability benefits again on January

18, 2006, also alleging disability beginning May 1, 1999. His applications were denied initially

on March 31, 2006, and again upon reconsideration on August 23, 2006. (Tr. 43-60). Plaintiff

requested a hearing, (Tr. 61), which was dismissed in error on August 31, 2007, (Tr. 62-63, 69-

70). The dismissal order was vacated on October 31, 2007. (Tr. 64). A hearing on plaintiff's

applications was held before an Administrative Law Judge ("ALJ") on November 19, 2008 (Tr.

14). Plaintiff, represented by Counsel, appeared and testified, as did a vocational expert. On

December 24, 2008, the ALJ rendered an adverse decision. (Tr. 14-25). On May 4, 2009, the

Appeals Council denied plaintiff's request for review. (Tr. 6-8).

At the time of the hearing and the ALJ's decision, plaintiff was 41 years old. Plaintiff has

a high school diploma and six months of coursework in computers at Business Career Training

Institute in Portland. (Tr. 144, 280, 447). He has past relevant work experience as a fast food

worker and fry cook. (Tr. 23). Plaintiff alleges disability beginning May 1, 1999, due to social

anxiety disorder, avoidant personality disorder, dysthymia, and degenerative disc disease of the

lumbar spine.

## BACKGROUND

Plaintiff was born in Santa Ana, California, the oldest of three children. (Tr. 278). His

mother left the family when he was six years old, and his father remarried two years later and

---

[1]Citations "Tr." refer to indicated pages in the official transcript of the administrative
record filed by the Commissioner on November 23, 2009 (Docket No. 10).

moved the family to Oregon. (Id.). Plaintiff reports that his stepmother was verbally abusive and his father was physically abusive, but denies being the victim of sexual abuse. (Tr. 278-79). At the age of twenty-five, plaintiff entered into a sexual relationship with a co-worker that lasted approximately one year. (Tr. 279). Plaintiff has not otherwise had any intimate personal relationships, and does not maintain any meaningful relationships with his father or siblings. (Tr. 279, 447, 456). Although plaintiff occasionally attends family gatherings, he keeps to himself and does not interact with his family at those events. (Tr. 417).

Plaintiff does maintain a relationship with his grandmother. Plaintiff lived with his grandmother for one year when he was twelve, and again later as a young adult for unknown periods of time. (Tr. 278-79, 416). Despite her own limited financial means, plaintiff's grandmother has supported him financially by paying for his housing and providing clothing. (Tr. 78, 181-88, 279, 456, 463). At the time of his application on January 25, 2006, plaintiff's grandmother was paying his rent, (Tr. 78), and plaintiff's medical reports show that he reported to his healthcare providers that his grandmother continued to pay his rent through at least May 3, 2006. (Tr. 387, 405, 407).

Plaintiff has maintained a stable residence since January 20, 2003, (Tr. 78), at an establishment called The West Hotel, (Tr. 449). Plaintiff has a single room, and shares a communal kitchen and bathroom with other tenants. (Tr. 450). At his hearing November 19, 2008, plaintiff testified that his grandmother moved into a retirement home two to three years ago and could no longer afford to support him. (Tr. 463). When his grandmother was no longer able to pay his rent, plaintiff entered into an agreement with his landlady to perform light janitorial work in exchange for rent, an arrangement he has maintained for the past two to three

Page 3 - REPORT AND RECOMMENDATION

years. (Tr. 449-454; 213). In addition to his current "barter" arrangement for rent, plaintiff also does light janitorial work for his landlady's husband at a warehouse one to two days a week, and is paid "under the table" at a rate of $10/hour, for an average of $80/week. (Tr. 451-452).

## Work history

Plaintiff went into the Navy after graduating high school, but reports he was discharged after six months for "failing to adapt to military life." (Tr. 447-448). He has an inconsistent work history, primarily in the fast food industry as a cook and cashier. Between the ages of twenty and twenty-five, plaintiff experienced his longest period of continuous employment, which lasted five years at Kentucky Fried Chicken. (Tr. 87, 280). Most recently, plaintiff was employed at Wendy's, where he worked as a fry cook. (Tr. 461). On his disability benefits application, plaintiff indicated he left Wendy's due to depression and back pain. (Tr. 148). However, in her October 28, 2005, psychological report and evaluation of plaintiff, Dr. Keli J. Dean recorded plaintiff told her he left Wendy's because the they would not increase his hours or teach him additional skills. (Tr. 280). And at his November 2008 hearing, plaintiff testified that he left Wendy's because his employer would not increase his hours or teach him additional skills. (Tr. 461).

Plaintiff has undergone vocational rehabilitation. (Tr. 454). In November 2005, plaintiff completed a one day training program and earned a certificate to work as a flagger. (Tr. 223, 454). However, plaintiff became ill shortly thereafter and did not follow up with his vocational rehabilitation counselor when he got well, or take the necessary steps to obtain the materials needed for the job. (Tr. 223-224, 228). Plaintiff testified at his November 2008 hearing that he was precluded from working as a flagger due to anxiety. (Tr. 454-455).

Page 4 - REPORT AND RECOMMENDATION

On February 24, 2006, plaintiff's treating physician Dr. Lee Walters recorded that plaintiff had started vocational rehabilitation and was dealing with a "prior distant felony." (Tr. 406). On April 4, 2006, plaintiff's mental health counselor at Multnomah County Health Department noted plaintiff reported he had been "unable to find work due to the nature of his felony." (Tr. 398).

**Criminal History**

When he was ten years old, plaintiff began sexually molesting his seven year old sister, and continued to do so for eight years until his sister reported the abuse and plaintiff, then eighteen, was convicted of rape. (Tr. 278). Plaintiff served a one-year sentence on the rape charges, and attended court ordered sex offender treatment for five years upon being released. (Tr. 281).

**Plaintiff's Back Pain**

Plaintiff reports chronic back pain ever since suffering a lumbar compression fracture after being struck by a car while riding a bicycle around 1991. However, his medical records show little treatment for back pain until 2004 and only minimal objective findings. The earliest medical record shows plaintiff was seen at Tuality Community Hospital ("Tuality") for back pain in September 1999 and, after a normal physical exam revealing only some tenderness in the L2-L4 level, diagnosed with paralumbar strain and prescribed Vicodin for pain. (Tr. 347). He was next seen for back pain nearly two years later, on July 23, 2001, at Legacy Good Samaritan Hospital ("Legacy"), and again received Vicodin for his pain, but was not physically examined. (Tr. 315). Plaintiff was homeless from approximately 1999 to 2003. (Tr. 22).

In February 2004, plaintiff presented at Legacy complaining of lower back pain; his medical record shows a negative straight leg raising test for both legs and prescription for

Page 5 - REPORT AND RECOMMENDATION

Vicodin. (Tr. 309-310). Plaintiff's treating physician Dr. O'Neill's medical records show plaintiff

needed medication for back pain on April 16. (Tr. 337). However, when plaintiff presented at

Providence St. Vincent Center ("Providence") on April 22 with complaints of back pain relating

to an on-the-job injury while working at Wendy's, he reported that he had no primary care

physician. (Tr. 234). The emergency room doctor performed a thorough physical examination

and yielded no objective evidence of injury or pain. (Tr. 234-235). When Dr. O'Neill saw

plaintiff on May 24 for a follow up related to his injury, he found that despite broad areas of

tenderness in the mid- to lower back, plaintiff's straight leg test was negative and his lower

extremity evaluation was normal. (Tr. 336). Dr. O'Neill prescribed Vicodin for pain and referred

plaintiff to physical therapy. (Tr. 257, 336).

Plaintiff was seen at Physical Therapy and Hand Clinic of Hillsboro, LLP ("Hillsboro

PT"), ten times between June 18 and August 9 of 2004, for back pain resulting from an on the job

injury occurring May 2, 2004. (Tr. 259). Plaintiff's physical therapists noted that while plaintiff

reported inconsistent subjective reports of improvement, he continued to tolerate treatment

without difficulty even when complaining of increased pain, and generally had a good prognosis.

(Tr. 241-262). Plaintiff told Dr. O'Neill that he discontinued physical therapy because SAIF

would not pay for it. (Tr. 328).

On July 13, Dr. O'Neill prescribed plaintiff Vicodin for "severe pain," noting plaintiff was

"triply cautioned" against concurrent use of alcohol, and scheduled an MRI. (Tr. 333). The MRI

results showed a disc herniation at L4-5 with a small sequestered fragment facing the thecal sac

and extending into the lateral recess. (Tr. 332-333; 343-344). After reviewing the MRI on July

27, Dr. O'Neill conducted a neurological examination of plaintiff and concluded "he ha[d]

Page 6 - REPORT AND RECOMMENDATION

absolutely nothing attributable to that," found plaintiff's lower leg exam "completely unremarkable, both sides," and his straight leg raising test negative, therefore Dr. O'Neill concluded the MRI results were "incidental" and recommended plaintiff continue physical therapy. (Tr. 332). Dr. O'Neill refilled plaintiff's Vicodin prescription on August 10. (Tr. 330-331). On August 17, Dr. O'Neill conducted another physical examination of plaintiff, which yielded results consistent with previous examinations, and released plaintiff for light duty work at plaintiff's request. (Tr. 329). Plaintiff requested a refill of his Vicodin prescription, which Dr. O'Neill wrote, but only at half the requested dosage. (Id.).

Four days later, on August 21, plaintiff presented at Tuality with complaints of low back pain, reporting aggravation of an prior injury. (Tr. 339-342). A physical examination yielded normal results; and the examining doctor prescribed Vicodin for pain and referred plaintiff to Dr. O'Neill for follow up. (Tr. 341-342). Three days later, on August 24, plaintiff presented to Dr. O'Neill with complaints of increased pain; however, Dr. O'Neill conducted a thorough physical examination which yielded completely normal results, noted he could not "get any particular muscle or sensory deficit attributable to the L4-5 right disk herniation," and declined to refill plaintiff's Vicodin prescription. (Tr. 328). Six days later, on August 31, plaintiff presented at Legacy with complaints of back pain, reporting that he had been evaluated by Dr. O'Neill as having a herniated disc. (Tr. 303-306). The attending physician noted he did not have the MRI, prescribed Vicodin, and referred plaintiff to Dr. O'Neill for follow up. (Id.). The records show Dr. O'Neill last saw plaintiff for coughing and chest congestion in September 2004, for which Dr. O'Neill first prescribed Hycodan, then switched to Vicodin at plaintiff's request, with a final Vicodin prescription September 23 on which Dr. O'Neill noted "no further refills." (Tr. 325).

In October 2005, in his evaluation by Dr. Dean, plaintiff reported a diagnosis of hypertension and denied having any other medical conditions. (Tr. 280).

Plaintiff was next seen for complaints of back pain in January of 2006, by Dr. Lee Walters, M.D., at the Multnomah County Health Department ("MCHD"). (Tr. 407). In March, plaintiff requested narcotics for his pain and was placed on a weekly pain management program with controlled substance testing. (Tr. 402-404). Plaintiff was started on methadone on April 28, which he initially reported kept him "comfortable all day." (Tr. 389). However, on May 3 he was referred to Dr. Walters for being "frustrated" with the low dose of methadone, (Tr. 387), yet two days later on May 5 reported to Dr. Walters that the methadone provided "very good pain relief," (Tr. 381). On May 12, Dr. Walters noted with apparent concern that plaintiff reported decreased symptoms of drowsiness and was out of methadone after just receiving a refill on May 3, and did not prescribe a refill. (Tr. 382). Dr. Walters set a follow up appointment for May 24, (id.), however, there are no further records of plaintiff's treatment at MCHD.

The last medical records regarding plaintiff's back pain show he received a prescription for Ultram, a narcotic-like pain reliever, through Westside Primary Care Clinic ("Westside") starting in February 2008. (Tr. 418). Plaintiff reported he was taking eight Ultram per day to manage his pain and reported withdrawal symptoms without it. (Tr. 429). It is unclear whether plaintiff successfully completed the recertification process for this medication. (Tr. 421, 429-430, 433).

Neither the MCHD nor the Westside medical records show any physical examination of plaintiff or reports of objective medical findings regarding his subjective complaints of pain. The most recent medical record showing a physical examination of plaintiff dates from March 14,

2006, when plaintiff was examined by Dr. Leslie King, M.D., in connection with his disability benefits claim. (Tr. 350-353). Dr. King reviewed plaintiff's 2004 MRI and conducted a thorough physical examination. (Id.). Despite plaintiff's subjective complaints of increased pain, Dr. King noted largely normal results, i.e. normal straight leg raising, no pont tenderness upon palpitation along the midline of the back, no muscle spasm, and normal motor strength with no evidence of atrophy; but also noted a limited range of motion. (Tr. 351-352). Dr. King recommended plaintiff have a full psychiatric evaluation done, noting that his depression and anxiety could worsen his condition and that he "seemed very disinterested, unmotivated, and exhibited poor effort overall." (Tr. 352).

**Plaintiff's Mental Impairments**

Plaintiff reported that he was involved in treatment for depression for approximately a year when he was 30, (Tr. 281), but there are no medical records for that period of time to confirm his diagnosis or treatment. Plaintiff's first clinical diagnosis occurred on March 26, 2004, when, at the request of plaintiff's grandmother June Ranf, Dr. O'Neill referred plaintiff to Dr. Wayne Russell, M.D. (Tr. 338). Dr. Russell assessed plaintiff as having chronic depression and provided samples of Effexor, (Id.), which Dr. O'Neill noted was "clearly" helping, (Tr. 337). It is unclear how Dr. Russell reached this diagnosis, as no clinical findings, test results, or reports are included in the record. Dr. O'Neill also attempted to coordinate with plaintiff's counselor, Helen Andrews of Fresh Approach Ministries. (Tr. 221-222, 337). It does not appear that Ms. Andrews is a licensed mental health professional; rather, her counseling activities appear to have been mainly addressing plaintiff's issues of self esteem and family relations. (Tr. 221-222).

In 2005, plaintiff was referred by his vocational rehabilitation counselor to Dr. Keli J.

Dean, Psy. D., for a cognitive and personality assessment. (Tr. 278-293). Plaintiff reported his diagnoses of hypertension, but denied having any other medical conditions. (Tr. 280). Dr. Dean noted plaintiff reported suffering from anxiety and depression since childhood, poor memory, suicidal ideation and one failed suicide attempt, and hypersensitivity to criticism; his sexual abuse of his sister and subsequent rape conviction and sex offender treatment; and drug and alcohol abuse as described below. (Tr. 280-281). Although plaintiff had poor eye contact and appeared "somewhat uncomfortable," he was alert, fully oriented, did not display any abnormal motor activity or memory deficit, displayed a full range of affect, and generally had fair insight and judgment. (Tr. 282).

Plaintiff's overall intellectual score as measured by the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III") was in the low average range, with a Verbal IQ in the low average range and Performance IQ in the borderline range. (Tr. 383). Dr. Dean stated his overall performance might have been "negatively affected by his anxiety and tendency to back down from difficult tasks," and was better understood by looking at his index scores separately. (Tr. 283). Plaintiff's Verbal Scale and Performance Scale displayed significant scatter, with his lowest scores in exercises assessing comprehension. (Id.). He scored average in Verbal Comprehension and Working Memory, and low average in Perceptual Organization and Processing Speed. (Tr. 283-284).

Dr. Dean ruled out the possibility that plaintiff has a learning disorder, finding that his broad achievement skills were all in the average range on both intellectual ability (WAIS-III) and academic performance on nine sub-tests of the Woodcock Johnson II, Tests of Achievement (WJ-III). (Tr. 283-284, 288-89). Dr. Dean specifically addressed plaintiff's grandmother's

Page 10 - REPORT AND RECOMMENDATION

concerns that he suffers from Aspergers or some form of autism, (Tr. 113-21, 181-89), finding that while plaintiff is socially isolated and perceived by those close to him as disinterested in social interaction, he did not "exhibit consistent impairments and diagnostic criteria in these areas to warrant this diagnosis." (Tr. 291).

Dr. Dean found that plaintiff's results under the Wechsler Memory Scale - Third Edition (WMS III), plaintiff's memory function was in the low average for working memory, and borderline for both immediate and delayed memory. (Tr. 285-286). Dr. Dean opined that these results were lower than expected given plaintiff's overall intellectual functioning, and that his performance might have been negatively affected by his social and performance anxiety. (Tr. 286). However, his poor performance indicated his memory skills might interfere with learning new tasks and recalling information while feeling anxious, such that he would benefit from being presented with information in multiple modalities and cues to assist with recall. (Tr. 289).

Overall, Dr. Dean assessed plaintiff with a GAF score of 50, and diagnosed him with generalized social disorder, avoidant personality disorder, and dysthymic disorder. (Tr. 288-289). Dr. Dean set out eight recommendations for "employment and educational settings" and six additional accommodations for "employment and training purposes." (Tr. 292-293).

On November 2, 2005, Dr. Jill E. Spendal, Psy. D., reviewed Dr. Dean's report, summarized her findings, and concluded that before plaintiff could be successful vocationally, he would need basic social skills training and counseling to treat his social phobia and low self esteem, and set out fifteen recommendations for how plaintiff's vocational rehabilitation counselor could best assist him. (Tr. 225). There is no evidence that Dr. Spendal separately examined plaintiff, administered tests, or reached independent conclusions. (Tr. 225-226).

Page 11 - REPORT AND RECOMMENDATION

In a March 9, 2006, behavioral health consultation at MCHD, plaintiff reported being depressed all his life, but denied a history of mental health problems or substance abuse. (Tr. 405).

On March 29, 2006, Disability Determination Services psychological consultant Dr. Dorothy Anderson, Ph.D., completed a Psychiatric Review Technique Form ("PRTF"), finding that plaintiff has moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 362-375). Dr. Anderson elaborated in the Mental Residual Functional Capacity Assessment ("MRFCA") attached to her PRTF, finding under "Understanding and Memory" that plaintiff is moderately limited in his ability to understand and remember detailed instructions, and under "Sustained Concentration and Pace" that he is moderately limited in his ability to carry out detailed instructions. (Tr. 376-379). In her functional capacity assessment of plaintiff, Dr. Anderson noted that plaintiff "shows the inability to maintain concentration for extended periods of time, however as long as [he] is given occ[asional] breaks (every couple of hours), [he] shows the ability to sustain concentration for an 8 hour workday," (Tr. 378).

On March 11, 2008, plaintiff was seen by Dr. James Thayer, M.D., at Westside Primary Care Clinic ("Westside"), who noted plaintiff wanted to start Zoloft again for his bipolar disorder, but was advised he needed a mood stabilizer first. (Tr. 428). On April 8, 2008, Dr. Richard Houle, M.D., noted that plaintiff had multiple psychological problems and a methamphetamine dependence, and recommended a psychiatric evaluation by a psychiatric nurse practitioner (Tr. 426). On May 8, 2008, Susan Marie,[2] Psychiatric Mental Health Nurse Practitioner ("PMHNP"), ruled out bipolar disorder diagnosis, and found that the clinical findings

---

[2]PMHNP Susan Marie's last name does not appear on the medical record.

Page 12 - REPORT AND RECOMMENDATION

and history were more consistent with plaintiff's diagnoses of dysthymia and social anxiety disorder from 2005. (Tr. 419).

**Plaintiff's Substance Abuse**

In his interview with Dr. Dean in October 2005, plaintiff admitted to daily use of marijuana between the ages of sixteen and nineteen, and "regular use" of alcohol and marijuana and episodic use of methamphetamines between the ages of thirty-two to thirty-six, when he was homeless. (Tr. 281). Plaintiff's medical records from Westside show that on April 8, 2008, Dr. Houle noted plaintiff had a methamphetamine dependence with "last reported use one year ago." (Tr. 426). On May 8, 2008, PMHNP Susan Marie noted that plaintiff had a history of methamphetamine dependence 20 years ago and "[h]ad some isolated use" when substance abuse testing was done, but that he readily agreed to substance abuse testing that day and "agree[d] to continue clean and sober." (Id.). However, at his November 2008 hearing, plaintiff reported last using controlled substances five years ago, and denied knowing where the reference that he last used methamphetamines a year a go came from. (Tr. 462).

Plaintiff has an extensive history of prescription narcotics use. On February 6, 2001, plaintiff presented at Providence with complaints of pain for a foot injury and received a prescription for Vicodin after an examination revealed a fracture in the proximal third metatarsal. (Tr. 237-239). Plaintiff denied "any other significant past medical history." (Tr. 237). On April 9, plaintiff sought and received another Vicodin prescription for foot pain at Legacy. (Tr. 319-320). Between June 14 and August 23, plaintiff sought and received six additional Vicodin prescriptions for dental pain from various attending physicians at Legacy, (Tr. 312-313, 314-318), before his seventh Vicodin request was finally denied by the attending physician at Legacy

on September 3, (Tr. 311).

Between February 3 and October 9 of 2004, plaintiff actively sought and received eleven prescriptions for Vicodin, obtaining them variously from Dr. O'Neill and one of five different physicians at three different hospitals. When Dr. O'Neill filled plaintiff's Vicodin prescription for only half the requested dosage on August 17, (Tr. 329), plaintiff sought and obtained a Vicodin prescription from the attending doctor at Tuality on August 21. (Tr. 339-342). When Dr. O'Neill did not prescribe Vicodin on August 24, (Tr. 328), plaintiff sought and obtained a Vicodin prescription from the attending doctor at Legacy on August 31. (Tr. 303-306). Dr. O'Neill prescribed Hycodan after diagnosing plaintiff with bronchitis on September 7, (Tr. 327), approved plaintiff's request for Vicodin instead of Hycodan on September 14, (Tr. 326), and allowed plaintiff a final Vicodin refill on September 23, but noted "no further refills," (Tr. 325).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995) (*citing* Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989)). In this context, the term "substantial evidence" means more than a mere scintilla, but less than a preponderance--it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Id.; *see also* Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879

Page 14 - REPORT AND RECOMMENDATION

F.2d 498, 501 (9th Cir. 1989).   Where the evidence is susceptible of more than one rational

interpretation, the court must defer to the Commissioner's conclusion.   Moncada, 60 F.2d at 523.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.   Howard v.

Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986).   To meet this burden, a claimant must demonstrate

an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months . . . ."   42 U.S.C. §

423(d)(1)(A).   A five-step sequential process is used to determine whether a person is disabled.

20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987); Lester v.

Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1995), as amended (Apr. 9, 1996).

At the first step, the Commissioner determines whether a claimant is currently engaged in

substantial gainful activity.   If so, the claimant is not disabled and the claim is denied.   20 C.F.R.

§§ 404.1520(a)(4)(I), 416.920(a)(4)(I).   If not, the inquiry moves to the second step.

At the second step, the Commissioner determines whether the claimant has a medically

severe impairment or combination of impairments that meets the twelve-month durational

requirement.   20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).   If claimant

does not have such a severe impairment, he is deemed not disabled.   Id.   If the claimant has a

severe impairment or combination thereof, the inquiry moves to the third step.

At the third step, the Commissioner determines whether the claimant's severe impairment

meets or equals a "listed" impairment in the regulation.   20 C.F.R. §§ 404.1520(a)(4)(iii);

416.920(a)(4)(iii); 20 C.F.R., Part 404, Subpart P, Appendix 1.   If so, disability is conclusively

Page 15 - REPORT AND RECOMMENDATION

presumed and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the Commissioner must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC") before proceeding beyond step three of the disability analysis.  20 C.F.R. §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p. The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, and should reflect the claimant's maximum remaining ability to perform sustained work activities in an ordinary work setting for eight hours a day, five days a week despite limitations imposed by his impairments.  SSR 96-8p. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical and non-medical facts.  Id.  The RFC is based on all relevant evidence in the case record, including the treating physician's medical opinions about what an individual can still do despite impairments.  Id.

At the fourth step, the Commissioner uses this information to determine whether the claimant can still perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  If the claimant has sufficient "residual functional capacity" to perform his past work, he is not disabled and the claim is denied.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant meets this burden, a prima facie case of disability is established and the inquiry advances to step five.

At the fifth and final step, the burden shifts to the Commissioner to establish that the claimant is capable of performing other work that exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); Yuckert, 482 U.S. at 142; Tackett v. Apfel, 180 F.3d 1094,

Page 16 - REPORT AND RECOMMENDATION

1099 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is deemed disabled. 20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966.

## THE ALJ'S FINDINGS

In the present case, the ALJ found that plaintiff had not engaged in substantial gainful activity since May 1, 1999 (the alleged onset date of disability), and June 30, 2006 (the date the ALJ determined Plaintiff was last insured for Disability Insurance Benefits). (Tr. 14.).

At the second step, the ALJ found that plaintiff suffered from the following medically determinable impairments: dysthymia, social anxiety disorder, avoidant personality disorder, polysubstance abuse (in remission), and chronic lower back pain with a history of lumbar disc herniation. (Tr. 16-17). The ALJ concluded that these impairments "cause more than a slight limitations [sic] in the [plaintiff's] ability to perform basic work activities." (Tr. 17). The ALJ also found that plaintiff has other medical conditions, such as hypertension and hyperlipidemia, which are adequately controlled through prescribed medication and do not cause significant limitations, and are therefore not severe. (Id.).

At step three of the analysis, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 17). Specifically, the ALJ found that (1) plaintiff is not precluded from effective ambulation or use of his upper extremities and that he has no significant reflex, sensory, or motor loss; and (2) plaintiff's mental disorders do not singly or in combination meet or medically equal listings 12.04, 12.06, 12.08, or 12.09, because neither the "paragraph B" or "paragraph C" criteria are satisfied.

The ALJ found that plaintiff had the residual functional capacity to perform light

exertional work. (Tr. 18-23). The ALJ's conclusion is supported by a narrative discussion describing how the evidence supports his assessment of plaintiff's physical and mental limitations, and cites specific medical and non-medical facts.

At the fourth step of the analysis, the ALJ found that plaintiff could not perform his past relevant work. In so finding, the ALJ specifically found that because he had already concluded that plaintiff's janitorial work for his landlady and her husband was not substantial gainful activity, it could not be considered past relevant work.

At the fifth and final step of the analysis, the ALJ found that plaintiff would be able to perform other work existing in the national economy. Accordingly, the ALJ determined that plaintiff is not disabled.

## DISCUSSION

Plaintiff argues that the ALJ erred  in his assessment of plaintiff's RFC by improperly discrediting his subjective statements, the statements of his lay witness, the psychological report of Dr. Dean, and the opinion of treating physician Dr. O'Neill. Plaintiff contends that as a result of these errors, the ALJ's RFC assessment does not accurately reflect all of his functional limitations. He further argues that the ALJ elicited testimony from the vocational expert ("VE") with improper assumptions based on the erroneous RFC assessment which, in turn, undermines the ALJ's conclusion that plaintiff is capable of working. To prevail on his Title II claim for disability insurance benefits, plaintiff must show that he was disabled within the meaning of the Social Security Act on or before the date he last satisfied the insured status requirements of the Act. 42 U.S.C. § 423(a)(1)(A); *see* Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). There is no insured status prerequisite for his Title XVI claim. 42 U.S.C. § 1382(a). However,

supplemental security income payments cannot be made retroactively. 20 C.F.R. §§ 416.203,

416.501; SSR 83-20, 1983 WL 31249.[3]  As a result, the relevant period for plaintiff's Title XVI

claim commenced in January 2006, when he filed his application.

## I. THE ALJ PROPERLY CONSIDERED THE MEDICAL RECORD

Plaintiff argues the ALJ committed reversible error by improperly discrediting the

opinions of his examining psychologist, Dr. Dean, and his treating physician, Dr. O'Neill,

regarding his functional capabilities.

### Standard

Courts categorize physicians as one of three types: (1) treating physicians, who treat the

claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

examining physicians, who neither examine nor treat the claimant. Lester, 81 F.3d at 830. As a

general rule, courts weigh the opinions of physicians according to the significance of their

clinical relationship with the claimant. Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155,

1164 (9th Cir. 2008).

ALJ may disregard the opinion of a treating physician, whether or not controverted;

however, the ALJ may only reject the *uncontroverted* opinion of a treating physician for clear

and convincing reasons. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (*citing*

Magallanes, 881 F.2d at 751). Likewise, an ALJ may only reject the uncontroverted opinion of

an examining physician for clear and convincing reasons. Id. (*citing* Pitzer v. Sullivan, 908 F.2d

---

[3]Social Security rulings are binding on the Administration. *See* Terry v. Sullivan, 903
F.2d 1273, 1275 n. 1 (9th Cir. 1990). Such rulings reflect the official interpretation of the Social
Security Administration and are entitled to some deference as long as they are consistent with the
Social Security Act and regulations. Massachi v. Astrue, 486 F.3d 1149, 1152 n. 6 (9th Cir.
2007)

502, 506 (9th Cir. 1990)).  An ALJ may satisfy the "clear and convincing" standard by noting the

presence of conflicting medical opinions in the record which are themselves based on

independent clinical findings.  Id.  In the face of conflicting medical evidence, it is the sole

province of the ALJ to determine credibility and resolve the conflict.  Thomas v. Barnhart, 278

F.3d 947, 956-57 (9th Cir. 2002).

### Dr. Dean's report

Substantial evidence supports the ALJ's determination that Dr. Dean's report does not

show how plaintiff's symptoms translate into specific functional deficits which preclude activity.

Dr. Dean identified several characteristics that might limit plaintiff's ability to obtain and retain

employment:  difficulty making decisions, inability to maintain financial independence, the need

for extended training or specialized instruction due to his social anxiety and avoidant personality

disorders, the need for extra time and assistance learning new skills due to poor memory,

hypersensitivity to criticism and difficulty with assertiveness, the appearance of limited

communication ability due to his social anxiety, and a need for more frequent breaks due to

anxiety and depressive symptoms.  (Tr. 290).  Dr. Dean also noted plaintiff experienced difficulty

with directions and finding his way to appointments without specific instructions, but concluded

that once he learned a route, his ability should not be impaired as demonstrated by his ability to

move around areas with which he was familiar.  (Id.).

Importantly, Dr. Dean did *not* find that plaintiff's other characteristics precluded him from

working.  Rather, Dr. Dean suggested that with mental health counseling, cognitive therapy, and

social skills training, many of plaintiff's other symptoms would abate, and suggested re-

evaluation at that time to "better assess" plaintiff's cognitive abilities.  (Tr. 291).  Dr. Dean then

listed a series of "recommendations" and "accommodations" for plaintiff's employment and training settings. (Tr. 291-293).

Plaintiff takes issue with the ALJ's assessment of his overall level of cognitive function, in particular, the ALJ's conclusion that Dr. Dean's estimate of plaintiff's score GAF as 50 appeared "artificially low" and "only a snapshot of the individual's functioning on a particular day." (Pl. Br. at 12). However, the court finds that the ALJ's assessment is supported by the substantial evidence in the record.

Dr. Dean is an examining physician, not a treating physician. Dr. Dean saw plaintiff only once, when plaintiff was referred to her for evaluation through his vocational rehabilitation program in October 2005. Despite recommendations for treatment, there is no indication that Dr. Dean administered such treatment, nor that she saw plaintiff for any reason following her one time evaluation. The ALJ based his conclusion that Dr. Dean's assessment of plaintiff's GAF was a snapshot of plaintiff's functioning in part on the fact that American Psychiatric Association ("APA") recognizes that the Global Assessment of Functioning, or GAF, is but one component of a psychiatric evaluation, a tool for assessing an individual's current functioning. Indeed, the APA recognizes that there is "day-to-day variability in functioning," thus GAF assessments should be conducted at regular periods over a course of treatment in order to allow proper assessment of functioning. American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 33 (4th ed., text rev., 2000) ("DSM-IV-TR").

The ALJ's conclusion is further supported by Dr. Dean's own observation that on three of the six tests administered (Wechsler Adult Intelligence Scale - Third Edition [WAIS-III];Wechsler Memory Scales - Third Edition [WMS-III]; Rey Complex Figure Test and

Page 21 - REPORT AND RECOMMENDATION

Recognition Trial [RCFT]; Stroop Color and Word Test) plaintiff's overall performance might have been negatively affected by his anxiety and tendency to back down from difficult tasks. (Tr. 283, 286-287). Dr. Dean also noted that plaintiff's self-reported psychological profile, as measured by the Millon Clinical Multiaxial Inventories - Third Edition (MCMI-III), indicated a "feeling of extreme vulnerability associated with a current episode of acute turmoil" and should therefore be "interpreted with a level of caution." (Tr. 287). In conclusion, Dr. Dean stated that plaintiff would benefit from being reevaluated in the future, after his anxiety disorder had been treated and he exhibited a decrease in symptoms, in order to better assess his *actual* cognitive abilities. (Tr. 289) (emphasis added). Dr. Dean also specifically noted that, given his history, plaintiff should be monitored for drug and alcohol use, and referred for chemical dependency support or treatment if he expressed the desire to use or was suspected of using either alcohol or drugs. (Tr. 291).

Thus, Dr. Dean herself questioned whether her assessment of plaintiff in October 2005 accurately reflected his actual cognitive abilities, as plaintiff's level of functioning appeared to be affected by his anxiety, which in turn appeared to be affected by a then-existing state of "turmoil" Dr. Dean concluded that plaintiff's overall condition would improve with proper treatment, and following such treatment he would benefit from reevaluation to determine his actual abilities. Dr. Dean's findings therefore support the ALJ's conclusion that the functional restrictions she suggested are subject to change based on whether and to what extent plaintiff seeks and receives treatment for his anxiety. To the extent that Dr. Dean's report is therefore internally ambiguous, it was the sole province of the ALJ's to determine credibility and resolve the conflict.

//

Page 22 - REPORT AND RECOMMENDATION

**The ALJ's Determination**

The ALJ accepted Dr. Dean's recommendation that plaintiff be limited to positions that do not require public contact or interpersonal interactions, concluding that plaintiff was capable of performing only unskilled work best performed alone with no public contact. (Tr. 22). The ALJ found, based on the testimony of the vocational expert, that this limitation obviated the need for some of Dr. Dean's other suggested "recommendations" and "accommodations," specifically, the need for a job coach, the requirement that plaintiff not be required to speak publicly or in-house, that he not be required to interact with others, that he be allowed to submit ideas in writing or via tape recorder rather than in a group or face-to-face, and that he not be required to attend meetings, group discussions, or work related social functions. (Tr. 23, 470-471).

The ALJ further noted that plaintiff's activities of daily living, involvement with vocational rehabilitation, and current work arrangement with his landlord and her husband indicated he had the capability to function with "less extreme limitations" than those outlined by Dr. Dean. The ALJ found that although plaintiff alleges he cannot work primarily due to social anxiety, he engages in activities inconsistent with an inability to perform all work activity, specifically, that plaintiff goes out every day, walks or uses public transportation, goes grocery shopping, spends time socializing with a couple living in the hotel where he resides, spends extensive time at the public library, and participates in vocational rehabilitation workshops. The ALJ found that plaintiff's ability to fulfill his janitorial work arrangements with his landlord and her husband, while part-time and not likely competitive employment, suggest he would be able to sustain a job where he worked alone.

Finally, the ALJ found that the plaintiff's current level of functioning is more a matter of

Page 23 - REPORT AND RECOMMENDATION

personal preference and choice then of unalterable medical circumstance. First and perhaps most significant, although the plaintiff reported on his January 2005 disability claim form that he left his job at Wendy's due to back pain and clinical depression, (Tr. 148), in October 2005 told Dr. Dean that he left Wendy's because they would not increase his hours or teach him additional skills, and denied having any medical condition other than hypertension. (Tr. 280). Likewise, in November 2008 plaintiff testified before the ALJ that he chose to leave Wendy's because they would not increase his hours or teach him additional skills. (Tr. 461).

Next, the ALJ noted that in November 2005, plaintiff completed training and passed the certification test to become a flagger. Plaintiff testified that this process consisted of one day of training, and thus is perhaps not in itself a substantial undertaking. However, the ALJ found significant that while plaintiff contended he never worked as a flagger because "the people issue came up" and that his anxiety precluded him from pursuing a job as a flagger, contemporaneous medical records show only that plaintiff was physically ill in late November and into December of 2005, (Tr. 294-301), and despite assurances to his vocational rehabilitation counselor that he would do so, (Tr. 223-224), there is no indication in the record that plaintiff followed up on the opportunity or even took the steps necessary to be equipped for a flagger job.

Finally, the ALJ noted that in the past, plaintiff's grandmother enabled him to remain unemployed, by paying his rent and providing other financial support. (*See* Tr. 78, 181-188, 279, 456, 463). While plaintiff has maintained his current residence since January 20, 2003 (Tr. 78), plaintiff testified it was not until his grandmother moved into a retirement home in 2006 and could no longer afford to support him, (Tr. 463), that he entered into his current arrangement with his landlord, bartering janitorial services for his rent, an arrangement he has maintained for

several years. (Tr. 213, 449-454). The ALJ noted that, when forced to find employment, plaintiff eschewed pursuing a flagger job and "instead obtained other employment which allows him to be relatively independent," and only to such an extent as to provide for his basic subsistence needs. (Tr. 21).

In concluding that plaintiff is capable of functioning under less severe restrictions than as set out by Dr. Dean, the ALJ also noted that in March 2006, plaintiff told his physical examiner Dr. King that he had been homeless before and "would just simply rather not associate with society with what [plaintiff] called 'the rat race' and just live more simply being homeless with no responsibilities." (Tr. 352). The ALJ did not consider this statement in isolation. Rather, the ALJ considered the statement in view of the fact that plaintiff had not demonstrated any interest in or attempt to pursue treatment for his anxiety disorder, despite Dr. Dean's recommendation that he do so and her opinion that such treatment would improve his overall condition. The ALJ also noted the April 19, 2004, letter from Helen Andrews, a counselor with Fresh Approach Ministries who at one time worked with plaintiff, which he could properly consider as lay evidence. It appears the ALJ considered Ms. Andrews' letter only to the extent that it supported Dr. Dean's opinion that if plaintiff received treatment for his anxiety, his overall functioning might improve--even when that treatment was provided by a person other than a licensed mental health professional.

Plaintiff's argument, that Ms. Andrews' reports of plaintiff's improvement in the workplace are of little or no value because he soon lost that job due to back injury and mental illness, is not well taken. Ms. Andrews worked with plaintiff while he was employed at Wendy's, and as discussed above, by plaintiff's own admissions he *chose* to leave Wendy's

Page 25 - REPORT AND RECOMMENDATION

because they would not increase his hours or teach him additional skills--he was not forced to leave because of his anxiety disorder.

### Dr. O'Neill

Plaintiff argues that the ALJ erred by rejecting the opinion of his treating physician Dr. O'Neill that his condition was not likely to improve and that it would be very difficult for him to secure and sustain employment.

Plaintiff correctly notes that the ALJ may not disregard Dr. O'Neill's opinion regarding plaintiff's mental limitations solely because Dr. O'Neill is a family practitioner, not a psychologist or psychiatrist. However, "[w]here the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." Andrews, 53 F.3d at 1041 (*citing* Magallanes, 881 F.2d at 751).

The ALJ rejected Dr. O'Neill's opinion that plaintiff's condition would not improve based on Dr. Dean's October 2005 evaluation and plaintiff's demonstrated abilities as described above. Dr. Dean's opinion that plaintiff's condition could improve was based on her independent clinical findings, thus her written evaluation is substantial evidence itself on which the ALJ could properly rely in resolving the conflict between Dr. O'Neill's and Dr. Dean's opinions. There is no indication that Dr. O'Neill had any independent clinical basis for his prognosis; rather, his opinion of plaintiff's disability appears to be premised largely on plaintiff's own account of his symptoms and limitations. Thus the ALJ could legitimately accord his opinion less weight, based on his determination that plaintiff was an unreliable source. An opinion of disability

premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded, once those complaints have themselves been properly discounted. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (internal citations omitted).

### Conclusion

On this record, the court finds that the ALJ properly considered Dr. Dean's report and Dr. O'Neill's opinion. To the extent that the ALJ rejected the functional restrictions recommended by Dr. Dean and Dr. O'Neill's opinion that plaintiff's condition would not improve, he provided clear and convincing reasons for doing so. The court finds the ALJ's determination, that plaintiff is not as limited by his anxiety disorder as he would have both his physicians and the court believe, is supported by the substantial evidence in the record.

## II. PLAINTIFF'S CREDIBILITY

Plaintiff asserts that the medical record supports his allegations of the functional restrictions caused by his social anxiety and back pain, and argues the ALJ's reasons for discrediting his testimony are not supported by the substantial evidence in the record. Defendant responds that the ALJ gave clear and convincing reasons to discredit plaintiff's claims, and properly found plaintiff to be less than credible based on the level of functioning suggested by plaintiff's daily activities, his record of conservative treatment, and his work history, criminal history, and substance abuse history.

### Standard

The ALJ may consider several factors when weighing the claimant's credibility, including: claimant's reputation for truthfulness; inconsistencies in claimant's testimony and between claimant's testimony, conduct, and daily activities; claimant's work record; and

testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms complained of. Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005); Thomas, 278 F.3d at 958-59. "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (*quoting* Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). However, the ALJ must provide "specific, cogent reasons" for discrediting a claimant's testimony when a medical impairment has been established. Morgan, 169 F.3d at 599 (*quoting* Lester, 881 F.3d at 834). If the ALJ finds the claimant's testimony regarding his symptoms and limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. Id. Absent evidence that the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony. Id. The court will not second-guess the ALJ's credibility finding if it is supported by substantial evidence in the record. Thomas, 278 F.3d at 959.

Here, the ALJ determined that plaintiff's impairments could reasonably be expected to produce some degree of the symptoms alleged by him but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC assessment.

**Plaintiff's Back Pain**

The ALJ first found that, while plaintiff reported a history of chronic lower back pain, he testified at the hearing that he experienced only intermittent back pain associated with heavy lifting or specific bending and twisting movements, and that the record demonstrates that his pain is helped by prescribed pain medications and exercise. The ALJ closely examined the medical record and noted that plaintiff's physical examinations have consistently yielded normal results,

Page 28 - REPORT AND RECOMMENDATION

and that, despite the 2004 MRI showing a showed a disc herniation at L4-5 with a small

sequestered fragment facing the thecal sac and extending into the lateral recess, plaintiff's treating

physician Dr. O'Neill found no objective evidence that any of plaintiff's subjective complaints

could be attributed to the MRI results. In fact, the medical records the ALJ relied on show that

on July 27, Dr. O'Neill conducted a thorough physical and neurological exam of plaintiff which

yielded "absolutely nothing attributable" to the MRI results and therefore concluded the MRI

results were "incidental" to plaintiff's subjective complaints. (TR. 332). And again on August

24, Dr. O'Neill conducted a thorough physical examination which yielded completely normal

results and noted he could not "get any particular muscle or sensory deficit attributable to the L4-

5 right disk herniation" despite plaintiff's subjective complaints of pain. (Tr. 328). "While

subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated

by objective medical evidence, the medical evidence is still a relevant factor in determining the

severity of the claimant's pain and it's disabling effects." Rollins v. Massanari, 261 F.3d 853, 857

(9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)); see 20 C.F.R. § 416.929(c)(2).

Dr. O'Neill's findings are consistent with those of examining physician Dr. King, who in

March of 2006 reviewed plaintiff's 2004 MRI and conducted a thorough physical examination.

(Id.). Despite plaintiff's subjective complaints of increased pain, Dr. King noted largely normal

results, i.e. normal straight leg raising, no pont tenderness upon palpitation along the midline of

the back, no muscle spasm, and normal motor strength with no evidence of atrophy. (Tr. 351-

352). While Dr. King did note a limited range of motion, the ALJ found significant that Dr. King

noted that plaintiff "seemed very disinterested, unmotivated, and exhibited poor effort overall."

(Tr. 352). Dr. King suggested that a full psychological evaluation be done because his anxiety

and depression could be aggravating his physical condition. (Tr. 352). However, just five months before Dr. Dean had conducted exactly such a psychological evaluation, and at that time plaintiff *denied* any significant medical conditions besides hypertension. (Tr. 280). Although Dr. King concluded that claimant could be expected to stand and walk in an eight-hour workday "with appropriate breaks," that he could sit for eight hours without restrictions, and that he could lift and carry 10 to 20 pounds frequently. (Tr. 352). Dr. King noted some possible postural limitations "secondary to subjective complaint of pain," (id.), the ALJ gave this part of the opinion little weight, as these restrictions were based largely on plaintiff's self reporting and conflicted with the otherwise largely normal examination results.

The ALJ also found that the plaintiff's back pain is helped by prescribed medications and exercise, and that he has required little treatment for back pain other than taking prescribed medications. This finding is supported by the record. Conservative treatment is a sufficient reason to discount a claimant's testimony regarding the severity of an impairment. Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007). While plaintiff contends he is only able to manage his pain through the use of heavy medication and that he has elected not to have back surgery only because he has been led to believe it might make his back pain worse, there is no indication in the record that plaintiff has actually consulted with a neurosurgeon. Plaintiff's physical therapy records show that even when plaintiff complained of increased back pain, he was able to tolerate treatment without difficulty. (Tr. 241, 250). A tendency to exaggerate is also a legitimate consideration in determining credibility. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). Whether the record supports the conclusion that plaintiff's heavy use of prescription narcotics is attributable solely to his back pain or instead indicates possible

Page 30 - REPORT AND RECOMMENDATION

prescription narcotics abuse is not addressed by the ALJ. The court finds the record inconclusive on that point and therefore declines to address plaintiff's argument.

### Plaintiff's Social Anxiety

The ALJ next found that plaintiff's claim that he is unable to sustain full-time work because of his social anxiety to be inconsistent with the weight of the evidence in the record. The ALJ closely examined the psychological evaluation report of Dr. Dean and the opinion of Dr. O'Neill, as described above, and plaintiff's own testimony. Ultimately the ALJ did not reject Dr. Dean's report, rather, he accepted her conclusions that plaintiff had an overall intellectual functioning in the low average range, her conclusion that plaintiff did not have a learning disorder or Aspergers, her conclusion that plaintiff would not do well in a position that required public contact or other situations provoking anxiety such as speaking in a group, and her conclusion that plaintiff's condition would improve with proper treatment. As discussed, the ALJ could properly reject Dr. O'Neill's opinion regarding plaintiff's prospects for improvement.

The ALJ found plaintiff's argument that his current "sheltered" arrangement to provide janitorial services for his landlord is the maximum that he can handle without decompensating to be not credible. In so concluding, the ALJ found significant plaintiff's choice not to seek treatment for his social anxiety and depression, despite Dr. Dean's conclusion that this treatment would improve his overall functioning. The ALJ further noted that in a March 9, 2006, behavioral health consultation at MCHD, plaintiff denied a desire for social contact. (Tr. 405). In this same visit, plaintiff reported being depressed all his life, but denied a history of mental health problems or substance abuse. (Id.). Plaintiff's failure to report symptoms or limitations to treatment providers is a legitimate consideration in determining the credibility of those

complaints. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006). The ALJ also found significant plaintiff's statement to Dr. King on March 14, 2006, that he "would just simply rather not associate with society with what [plaintiff] called 'the rat race' and just live more simply being homeless with no responsibilities." (Tr. 352). Finally, the ALJ noted that plaintiff testified he is taking Zoloft to manage his depression, although his dosage was recently increased, and that his anxiety symptoms are well controlled by prescription Ativan.

The ALJ found plaintiff is capable of functioning in groups and in public situations, as demonstrated by his completion of flagger training and other workshops, his extensive use of the public library to look for jobs and use his email, and his ability to use public transportation. However when plaintiff was forced to be self-sufficient due to his grandmother's inability to continue to support him financially, he did not pursue the flagger job but instead established the current janitorial work arrangement with his landlord and her husband, which allows him to be relatively independent. While the ALJ determined that plaintiff's janitorial work arrangement with his landlord and her husband was not substantial gainful activity, he did conclude that it suggests plaintiff would be able to sustain a job where he worked alone.

The ALJ found significant that plaintiff has been able to maintain this arrangement for several years, yet did not seek it out until forced to do so because his grandmother was no longer able to support him financially. Where a plaintiff has an extremely poor work history and has shown little propensity to work in his lifetime, there is a lack of objective medical evidence to support the plaintiff's descriptions of his pain and limitations, and there is evidence that the plaintiff failed to give maximum or consistent efforts during physical capacity evaluations, this may be considered by the ALJ as specific, clear, and convincing evidence to discredit a

Page 32 - REPORT AND RECOMMENDATION

claimant's claimed inability to work. Thomas, 278 F.3d at 958-59.

Plaintiff lives alone, does his own cleaning, laundry, shopping, and meal preparation, and goes out into public every day, either walking or using public transportation. He maintains a relationship with his grandmother and also spends time socializing with a couple who live in the hotel where he resides. Daily activities of a claimant may be used by the ALJ to show capability of performing competitive work on a sustained basis, and the ALJ's interpretation of the evidence here is reasonable and supported by the record. *See* Burch, 400 F.3d at 680-81; Thomas, 278 F.3d at 959; Fair, 885 F.2d at 603.

### Conclusion

The ALJ's reasons for discounting plaintiff's credibility determination are supported by substantial evidence in the record.

## III. LAY WITNESS CREDIBILITY

Plaintiff contends that the ALJ failed to provide clear, convincing, and germane reasons for not fully crediting the testimony of his grandmother, June Ranf, as a lay witness.

An ALJ must consider the testimony of friends and family members. Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996). To disregard such lay testimony violates 20 C.F.R. §§ 404.1513(e)(2) and 416.913(e)(2). *See* SSR 96-7p. "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

Ms. Ranf submitted two questionnaires and a letter describing her observation of plaintiff's medical and mental impairments. (Tr. 114-120, 181-188, 416-417). In these, Ms.

Ranf opined that plaintiff suffers from some form of autism or Aspergers.  The ALJ properly

disregarded these statements as not consistent with the opinions of Dr. Dean or Dr. Spendal.

Medical diagnoses are beyond the competence of lay witnesses and do not constitute competent

evidence.  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  Ms. Ranf also submitted that

plaintiff suffers from "unbearable migraines."  The ALJ properly disregarded this statement as

plaintiff does not contend he suffers from this condition and nowhere in the record is there

support for Ms. Ranf's allegation.

However, plaintiff argues the ALJ improperly disregarded Ms. Ranf's testimony regarding

his mental impairments, specifically his inability to follow simple instructions, and the opinions

of Dr. Dean and Dr. Spendal that he would need a supervisor to frequently check in with him to

ensure he understands what he needs to do, his need for repetitive instruction, and extra time to

complete tasks.  Plaintiff contends the ALJ failed to account for these restrictions in assessing

plaintiff's RFC, and that testimony elicited from the vocational expert shows that such functional

restrictions preclude competitive employment.

The ALJ's determined that Ms. Ranf's concerns testimony regarding plaintiff's back pain

and social anxiety were accommodated by plaintiff's RFC assessment as described in his

discussions relating to plaintiff's credibility and the medical record.  As described above, in

reaching those determinations, the ALJ found that plaintiff had been able to sustain a working

arrangement with his landlord and her husband, doing janitorial work in exchange for rent and

for under-the-table cash payments, and had done so for several years.  Plaintiff testified he

completes these tasks free of any supervision, at his own pace, without any need for repetitive

instructions.  The ALJ concluded that his ability to perform this work indicated he would be able

Page 34 - REPORT AND RECOMMENDATION

to sustain employment if allowed to work independently in a position that, consistent with the opinions of Dr. Dean and Dr. Spendal, did not involve public contact or interaction with others.

For the reasons described above, the court finds the ALJ's decision to disregard Ms. Ranf's testimony with regard to these limitations is supported by substantial evidence on the record. To the extent plaintiff contends the ALJ failed to account for these restrictions in assessing plaintiff's RFC, and that testimony elicited from the vocational expert shows that such functional restrictions preclude competitive employment, that argument is addressed below.

## IV. VOCATIONAL EXPERT'S TESTIMONY

Plaintiff argues that the hypothetical posed to the vocational expert by the ALJ failed to include any limitation that reflect the ALJ's determination that he has a moderate limitation in concentration, persistence, and pace. Defendant argues that the ALJ properly incorporated all credible limitations into his assessment of plaintiff's RFC, therefore the hypothetical posed to the vocational expert reflected all of plaintiff's functional limitations.

### Standard

If a claimant shows that he cannot return to his previous work, the Commissioner must show that the claimant can do other kinds of work. Magallanes, 881 F.2d at 756. The Commissioner may carry this burden by eliciting the testimony of a vocational expert in response to a hypothetical that sets out all the limitations and restrictions of the claimant. Id. "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). Although the hypothetical may be based on evidence which is disputed, the assumptions in the hypothetical must be

supported by the record.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).

### The Vocational Expert's Testimony

The ALJ posed a hypothetical in which a claimant of plaintiff's age, education, and prior work experience was capable of performing light level unskilled work, with only occasional climbing of ladders, ropes, or scaffolding, with no public contact, performed alone and not as part of a team in the workplace.  With these restrictions, vocational expert ("VE") Scott Stipe testified plaintiff could not perform any of his past relevant work.  The VE further opined that, although defined as a semi-skilled occupation by the DOT, employers typically describe the position of janitor as unskilled.  The ALJ and the vocational expert are not bound by the DOT's characterization of occupations because the Social Security regulations do not obligate them to rely on the DOT's classifications.  Wright v. Massanari, 321 F.3d 611, 616 (9th Cir. 2003).  The ALJ is entitled to rely on the testimony of the vocational expert in reaching a decision.  Id.  The VE further testified that the position of janitor is typically medium level work, and that plaintiff's arrangement with his landlord and her husband would be considered light work.  (Tr. 465-466).  Therefore, the VE testified that plaintiff could not perform any of the jobs he had previously performed as they are typically performed.  (Tr. 466).  However, the VE testified that plaintiff could perform the job of small products assembler, hand packager, and folder, all of which exist in significant numbers in the national economy.  (Id.).

The ALJ next added a limitation that, because of an affective or other mental disorder, the claimant would suffer attention and concentration deficits at unpredictable times in the workplace, which could lead to unpredictable absences up to one day per week.  The VE first testified that this level of absenteeism would preclude competitive employment, (Tr. 466-467),

Page 36 - REPORT AND RECOMMENDATION

however, in response to follow up questions by plaintiff's counsel, the VE testified that at a rate of about one unexcused absence per month there would be a fair potential to retain competitive employment, (Tr. 467).

In response to plaintiff's counsel's hypothetical that the claimant would be limited to a maximum of 20 hours per week, the VE testified that the claimant would not be able to sustain competitive employment. (Tr. 468-469). The ALJ may not incorporate limitations or restrictions that are not supported by the record. SSR 96-8p. Nowhere in the record is there any support for plaintiff's counsel's limitation that plaintiff is only able to sustain part-time employment at a maximum of 20 hours per week. Therefore, the ALJ could properly disregard this testimony.

Finally, the VE testified that, assuming a hypothetical claimant with no physical limitations, the requirements of a job coach in assisting in situations requiring assertiveness or negotiating interpersonal interactions, frequent positive feedback when learning new skills, an environment not requiring interaction with others, presentation of information through multiple modalities when learning new information, repetitive instruction to assist with learning and retention, allowing the claimant to present ideas in writing or via tape recording rather than face-to-face or in groups, allowing more time to learn new tasks, allowing frequent breaks to assist with managing anxiety symptoms, and not requiring participation in meetings or group discussions, would each present a substantial obstacle to competitive employment. (Tr. 469-470). On redirect by the ALJ, the VE testified that the need for a job coach would present the most substantial obstacle, and that some of these requirements would not apply to unskilled jobs and in particular not to the jobs which the VE testified would be available to the hypothetical claimant. (Tr. 470-471). However, the VE did not address the limitations individually to

identify which would not apply.

### Discussion

Here, the ALJ accepted medical evidence that plaintiff has moderate difficulty maintaining concentration, persistence, and pace. Indeed, the ALJ specifically found that "[w]ith regard to concentration, persistence or pace, [plaintiff] has moderate difficulties," and that plaintiff's "ability to concentrate and persist in a task is reduced by symptoms of anxiety and depression." (Tr. 17). These findings are consistent with the opinion of both Dr. Dean and Dr. Anderson's MRFCA determination.

The ALJ explained he believed that plaintiff had limitations due to anxiety because of the opinion of Dr. Dean; however, he also accepted Dr. Dean's opinion that plaintiff's limitations would improve with proper treatment. The ALJ further noted that plaintiff testified at the hearing that his anxiety symptoms were well controlled by prescription medication, (Tr. 458), which he was not taking this medication at the time of Dr. Dean's psychological evaluation.

However, the ALJ did not explain whether or how this affected plaintiff's difficulties maintaining concentration, persistence or pace, and there is no subsequent evaluation or other evidence in the record which demonstrates that in fact plaintiff's prescription medication has improved his functional capabilities. Therefore, while the ALJ properly limited plaintiff to unskilled work best performed alone with no public contact, consistent with the opinions of Dr. Dean and consulting psychologist Dorothy Anderson, Ph.D., (Tr. 376-379), the ALJ's initial hypothetical question to the vocational expert referenced only "unskilled, light work," without including limitations on concentration, persistence or pace. This was error.

Defendant's contention that restricting plaintiff to "unskilled, light work" encompasses his

Page 38 - REPORT AND RECOMMENDATION

difficulties with concentration, persistence or pace is not persuasive. For example, repetitive, assembly-line work might well require extensive focus or speed. For reasons that are unclear to the court, the ALJ translated plaintiff's difficulty in concentration and attention to mean that he will have problems with absenteeism. (Tr. 466). The court finds no evidence in the record to support this conclusion, nor does the court find that by informing the VE that plaintiff might be expected to be unexpectedly absent due to attention and concentration deficits the ALJ adequately incorporated plaintiff's limitations of concentration, persistence and pace. At most, this subsequent question shows that the ALJ recognized these difficulties would have additional limiting effects on the plaintiff beyond those encompassed in the original hypothetical. While the ALJ did later elicit testimony from the VE that some of the functional restrictions set out by Dr. Dean, and posed as limitations to the VE in a question by plaintiff's counsel, would not apply to the jobs the VE testified were available to plaintiff, it is impossible to tell which restrictions would apply and which would not, and to what occupations.

### Conclusion

Having concluded that plaintiff has moderate limitations of concentration, persistence, and pace, the ALJ erred by omitting these limitations from both his RFC assessment and the hypothetical posed to the VE. Where, as here, a hypothetical fails to reflect each of the claimant's limitations supported by substantial evidence, the vocational expert's answer has no evidentiary value. Gallant, 753 F.2d at 1456. Accordingly, the case should be remanded so that the ALJ can reformulate the hypothetical to the VE to include the limitations noted above. *See* Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal

quotation marks omitted). Furthermore, the ALJ shall ask the VE individually about each functional restriction suggested by Dr. Dean, to identify which, if any, apply to the occupations identified as available to plaintiff, and how they affect his prospects for employment.

## RECOMMENDATION

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision that plaintiff did not prove disability and is not entitled to disability insurance benefits or supplemental security income under Titles II and XVI of the Social Security Act is based on correct legal standards and supported by substantial evidence. It is recommended that the Commissioner's decision be affirmed with regard to his determination of the medical record and the credibility of plaintiff and the lay witness, but that the case be remanded to the Commissioner so that the ALJ can clarify his hypothetical to the vocational expert and clarify which functional restrictions apply due to his moderate limitations with concentration, persistence and pace.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by January 4, 2011 If objections are filed, any response to the objections are due by January 24, 2011. See* Fed. R. Civ. P. 72, 6.

DATED this _____ day of December, 2010.

_____
MARK D. CLARKE
United States Magistrate Judge

Page 40 - REPORT AND RECOMMENDATION